**BENSALEM TOWNSHIP**

v.

**WESTERN WORLD INSURANCE COMPANY.**

Civ. A. No. 84–2068.

United States District Court, E.D. Pennsylvania.

April 15, 1985.

Emil F. Toften, Emil F. Toften & Associates, Chalfont, Pa., for plaintiff.

Richard S. March, Galfand, Berger, Senesky, Lurie & March, Philadelphia, Pa., for defendant.

## MEMORANDUM

LOUIS H. POLLAK, District Judge.

Plaintiff Bensalem Township seeks a declaration that defendant Western World is contractually bound to cover any liability which plaintiff may incur in *Johnson v. Township of Bensalem,* Civil Action No. 83–0449 (E.D.Pa.), an age discrimination action brought by the widow of a former Bensalem Township police officer. See 609 F.Supp. 1340. Defendant has counterclaimed for a declaration of non-coverage, arguing that the insurance policy in question excludes coverage for (1) claims made before February 21, 1982, and (2) claims arising out of willful violations of federal or state statutes. The parties have stipulated to the relevant facts,[1] and have filed cross-motions for summary judgment.

## I. *Statement of Facts*

### A. *The Johnson Litigation*

The facts are uncomplicated. On January 31, 1981, Sergeant William L. Johnson retired from the Bensalem Township Police Department. Sergeant Johnson, then fifty-four years old, was required to retire under the township's mandatory retirement policy for police officers. Sergeant Johnson died on May 11, 1981. Four months later, on September 18, 1981, Harriet Johnson, the Sergeant's widow, filed an age discrimination charge with the Equal Employment Opportunity Commission. On September 24, 1981, the township received a letter from the EEOC notifying the township that a discrimination charge had been filed against it. The EEOC letter stated in full:

---

1. The parties have also agreed that Pennsylvania law applies to this diversity breach-of-contract action.

This is to notify you that the above captioned "charge" has been filed under the provisions of the Age Discrimination in Employment Act of 1967, as amended in 1978, alleging an unlawful discriminatory practice. Charge is defined as a written statement identifying the prospective defendant and generally describing the alleged discrimination. A statement summarizing the particulars of the charge is enclosed.

The law provides that after receiving such a charge, the Equal Employment Opportunity Commission (EEOC) is required to notify the prospective defendant and try to eliminate any alleged unlawful practice by informal conciliation, conference, and persuasion.

An Equal Opportunity Specialist will contact you in the near future to review the circumstance involved in this case and, if possible, to work out some solution consistent with the statute and agreeable to the parties.

Letter from Marvin Meyers, ADEA Supervisor, to Director of Personnel, Township of Bensalem (Sept. 22, 1981) (attached as Exhibit B to the Stipulation of Facts). The enclosure to which Mr. Meyers' letter refers was a copy of the charge itself. That document contained the following two-sentence explanation of Mrs. Johnson's age discrimination claim:

On January 31, 1981, my husband, William L. Johnson (deceased), was forced to retire at age 54, after 25 years of service as a Police Officer.

Respondent's policy stated that employees with 25 years of service and were [sic] 50 or more years of age had to retire.

Charge of Discrimination (attached as Exhibit A to the Stipulation of Facts).

Six months later, on March 22, 1982, the township received a letter from one Kevin J. Berry, who was identified as the "Equal Opportunity Specialist" to whom the Johnson matter had been assigned. Mr. Berry's letter briefly discussed the EEOC's procedure of seeking voluntary settlement of discrimination charges, and requested some

general information concerning the township's retirement policy for police department personnel. Letter from Kevin J. Berry to Natalie A. Strange, Township Manager (March 19, 1982) (attached as Exhibit C to the Stipulation of Facts).

On June 9, 1982, the township received the EEOC's determination that the township had violated section 4(a)(1) of the ADEA, 29 U.S.C. § 623(a)(1). Letter from Johnny J. Butler to Natalie A. Strange (June 7, 1982) (attached as Exhibit E to the Stipulation of Facts). Pursuant to section 7 of the ADEA, 29 U.S.C. § 626(d), the EEOC sought to achieve a voluntary settlement of the charge, but to no avail. On December 22, 1982, the township's attorney was informed that Mrs. Johnson would bring suit in federal court on her age discrimination claim; that suit was filed on January 27, 1983. Mrs. Johnson's complaint sought damages for wrongful discharge and willful violation of the ADEA.

Plaintiff notified its insurance carrier of the potential claim against it by a letter dated June 23, 1982—shortly after the EEOC determination but well before suit was instituted. Letter from Henry F. Huhn to Marie Bader (attached as Exhibit F to the Stipulation of Facts). Western World and the township exchanged several letters over the course of the next few months, and on April 7, 1983, Western World notified the township that, while it would defend the township against Mrs. Johnson's claim, it reserved the right to disclaim coverage at any time. Letter from Michael P. Sotland to Bensalem Township (April 7, 1983) (attached as Exhibit I to the Stipulation of Facts). This letter cited a number of policy exclusions, including the provision excluding from coverage losses arising out of "the willful violation of statute or ordinance committed by or with the knowledge of the insured." *Id.*

As the *Johnson* litigation moved forward, the parties filed cross-motions for summary judgment on a number of issues. In a Memorandum and Order entered May 22, 1984, I granted Mrs. Johnson's motion

for summary judgment on the liability portion of her ADEA claim against the township. *Johnson v. Township of Bensalem,* Civil Action No. 83–0449, Memorandum/Order (E.D.Pa. May 22, 1984). Included in this determination was the express finding that defendant willfully violated the ADEA within the meaning of *Wehr v. Burroughs Corp.,* 619 F.2d 276 (3d Cir.1980). *Id.* at ¶ 5.

## B. *The Parties' Contentions*

Plaintiff seeks coverage under a "claims made" policy,[2] covering "any claim or claims [which] are first made against the insureds" during the policy period. The policy period runs from February 21, 1982 to February 21, 1983. Defendant argues that the "claim" in the *Johnson* case was "first made" on September 24, 1981, when the township received its notification of the EEOC charge which Mrs. Johnson had filed against it. In addition, defendant maintains that the *Johnson* litigation arises out of "the willful violation" of the ADEA—citing the Memorandum/Order granting Mrs. Johnson's summary judgment motion on that issue—and is therefore excluded from insurance protection under the policy provision quoted in its reservation of rights letter. Plaintiff contends that (1) defendant is estopped from denying coverage on the basis of the date the claim was first made, because defendant failed to invoke that theory when reserving its right to disclaim coverage in April 1983; (2) in any event, no "claim" was made against plaintiff until December 1982, when plaintiff was first notified that suit would be brought against it; and (3) the "willful violations" exclusion does not apply because the term "willful" carries different meanings in ADEA litigation and in the insurance policy.[3]

## II. *Estoppel*

Plaintiff argues that defendant may deny coverage only on those grounds specifically raised by defendant's letter of April 7, 1983. In that letter, defendant promised to defend plaintiff in the *Johnson* litigation, but reserved the right to disclaim coverage for any liability that litigation might generate. The letter does not explain the reasons why plaintiff's insurance policy might not cover Mrs. Johnson's lawsuit, but simply quotes several policy provisions which exclude certain categories of injuries or conduct from insurance coverage. Nowhere does the letter refer to the "claims first made" provision of plaintiff's insurance policy. Plaintiff contends that defendant is therefore estopped from invoking that provision now.

The Pennsylvania Supreme Court has stated that "[t]he essential elements of estoppel are an inducement by the party sought to be estopped ... to the party who asserts the estoppel ... to believe certain facts to exist—and the party asserting the estoppel *acts in reliance on that belief.*" *Sabino v. Junio,* 441 Pa. 222, 272 A.2d 508, 510 (1971) (emphasis in original). Thus, in *Slater v. General Cas. Co. of America,* 344 Pa. 410, 25 A.2d 697 (1942), the insurer initially denied coverage because the policy had been cancelled. The policyholder subsequently failed to forward copies of the summons and complaint to the insurer, as required by the policy. The court found that, due to the insurer's insistence that the policy had been cancelled, "the insured properly thought it useless to comply further with the requirements of the policy." 25 A.2d at 699. Having in effect caused the policyholder to violate the policy, the insurer could not rely on the violation to

---

**2.** "Claims made" policies are the insurance market's alternative to the more common "occurrence" policies. "An 'occurrence' policy protects the policyholder from liability for any act done while the policy is in effect, whereas a 'claims made' policy protects the holder only against claims made during the life of the policy." *St. Paul Fire & Marine Ins. Co. v. Barry,* 438 U.S. 531, 535 n. 3, 98 S.Ct. 2923, 2926 n. 3, 57 L.Ed.2d 932 (1978). *See generally* Comment,

*The "Claims Made" Dilemma in Professional Liability Insurance,* 22 U.C.L.A. L.Rev. 925 (1975).

**3.** Plaintiff also raises arguments with respect to other exclusions. Because defendant relies solely on the "claims first made" and "willful violations" provisions, I need not address any other provisions of plaintiff's policy.

withhold coverage. *See id.* at 699–700. *See also Beck v. Pennsylvania National Mut. Cas. Ins. Co.,* 429 F.2d 813, 818 (5th Cir.1970) (applying Pennsylvania law) (where insurer denied coverage and refused to defend action against policyholder, insurer could not invoke policyholder's subsequent failure—in violation of the policy—to tell insurer of any settlement offers).

■ The converse of this principle is of course that where the party asserting estoppel has not changed its position in reliance on its opponent's representation, estoppel will not be found. *See, e.g., Guardian Life Ins. Co. v. Zerance,* 505 Pa. 345, 479 A.2d 949, 954 (1984); *Blofsen v. Cutaiar,* 460 Pa. 411, 333 A.2d 841, 844 (1975); *Pfeiffer v. Grocers Mut. Cas. Ins. Co.,* 251 Pa.Super. 1, 379 A.2d 118 (1977). In *Pfeiffer,* recovery was sought for the mistaken demolition of two buildings. The insurer first denied coverage on the basis of untimely notice; later, the insurer suggested that the policy might not apply because it was not in effect on the date of the demolition. Only after these contentions were lost or abandoned did the insurer argue that the policy did not cover the buildings which had been mistakenly destroyed. 379 A.2d at 120. The Pennsylvania Superior Court found that, under *Slater,* estoppel was inappropriate, since the claimant "offered no proof that he reasonably relied on appellant's initial grounds for denying liability or that he took action to his prejudice pursuant to such reliance." *Id.* at 121. *Accord Meth v. United Benefit Life Ins. Co.,* 198 F.2d 446, 447 (3d Cir.1952); *Wasilko v. Home Mut. Cas. Co.,* 210 Pa.Super. 322, 232 A.2d 60, 63 (1967).[4]

■ Plaintiff has not shown that it changed its position in reliance on defendant's April, 1983 letter.[5] All the events that bear on the question of when the claim was first made had taken place by the time that letter was written. Plaintiff's argument on when the claim was first made would be in no way different if defendant cited that section of the policy in its letter. Accordingly, I find that defendant is not estopped from arguing that the Johnson claim was not first made within the policy period.

### III. *When Was the "Claim" First Made?*

■ The question of when the "claim" was "first made" in this case turns on the definition of "claim." If, but only if, the September, 1981 letter from the EEOC and the age discrimination charge which that letter announced constitute a "claim," then defendant is entitled to summary judgment on this issue, since the policy did not take effect until February 21, 1982. Unfortunately, the insurance policy does not define

---

**4.** *Perkoski v. Wilson,* 371 Pa. 553, 92 A.2d 189 (1952), on which plaintiff relies, is wholly consistent with *Pfeiffer.* The insurer in *Perkoski* defended, *without reservation,* a policyholder in an automobile accident case brought by an injured husband and wife. At no time did the insurer tell the policyholder that his coverage was in doubt, except insofar as the damages might exceed the overall policy limit of $10,000 per person and $20,000 per accident. After the verdict (which was within the policy limit), the insurer argued that a portion of the damages was not covered, on the ground that the husband's damages were in part derivative of the wife's, and were therefore to be counted against her $10,000 limit. The Pennsylvania Supreme Court found that when the insurer undertook its policyholder's defense, "[i]t was ... incumbent upon the company to inform its policyholder of its prospective adverse interest with respect to the extent of its liability under the terms of the policy." 92 A.2d at 191. Accordingly, the insurer was estopped from making its claim. *Id.*

In *Perkoski,* the policyholder *did* change his position in reliance on the insurer's silence: he failed to obtain his own counsel to litigate the case. Since the insurer's argument rested squarely on the nature and amount of the damages awarded, different litigation tactics could well have affected the verdict to the policyholder's benefit. Here, by contrast, the resolution of the "claims first made" issue does not turn on any factual or legal determination which has been or will be made in the *Johnson* case. Plaintiff could not, therefore, claim it is prejudiced by having relied on Western World to defend it against Mrs. Johnson's lawsuit.

**5.** The party asserting estoppel has the burden of establishing its prerequisites "by clear, precise and unequivocal evidence." *Chrysler Credit Corp. v. First National Bank & Trust,* 746 F.2d 200, 206 (3d Cir.1984) (*per curiam*). In this case, plaintiff has introduced *no* evidence that might suggest detrimental reliance.

"claim." The policy does, however, contain a notice provision which sheds some light on the term. Article VI of the policy, titled "Notice of Claim," reads, in relevant part:

(a) If during the policy period ... the Public Entity or any insureds shall receive written or oral notice from any party that it is the intention of such party to hold the insureds responsible for a Wrongful Act, they shall give written notice to the Company ... as soon as practicable, but in no event exceeding one year, then any claim which may subsequently be made against the insureds arising out of such Wrongful Act shall, for the purpose of this policy be treated as a claim made during the policy year in which such notice was given during the extended discovery period, as a claim made during the last policy year.

(b) The Public Entity ... shall, as a condition precedent to their rights under this policy, give the Company notice in writing as soon as practicable of any claim made and shall give the Company such information and cooperation as it may reasonably require.

The grammatical incoherence of this language makes it difficult to construe. Nevertheless, the two quoted paragraphs seem plainly to distinguish a "claim" from a "notice that it is the intention of [a potential claimant] to hold the insureds responsible for a Wrongful Act." Paragraph (a) appears designed to permit the policyholder to obtain coverage for claims not yet filed, but which the policyholder reasonably anticipates. Thus, the policyholder may trigger the policy by passing on to the insurer any written or oral notice that the policyholder is to be "held responsible." Such action insures coverage for *any claim* which may *subsequently* be made" against the policyholder, notwithstanding that the "claim ... subsequently ... made" is presented after the close of the "policy year." Difficult as it is to parse, the language of the first paragraph strongly suggests that "notice that it is [someone's] intention to hold the insureds responsible for a Wrongful Act" is an event commonly antecedent to and *different in kind from* a

"claim." Paragraph (b) fortifies this inference, since it appears to describe the ordinary procedure for giving notice of a "claim." And paragraph (a) would be needless if a notice of intention to hold the policyholder responsible was the same as a "claim."

Plaintiff argues, correctly in my view, that the EEOC letter of September 1981 was at most a notice that Mrs. Johnson intended to hold plaintiff responsible for a wrongful act. Neither the letter nor the attached charge of discrimination requested money or other relief; neither document stated that a lawsuit was to follow. The closest the letter comes to any such formal demand is the statement that, upon receiving a charge of discrimination, the EEOC "is required to notify the prospective defendant and try to eliminate any alleged unlawful practice by informal conciliation, conference, and persuasion." Meyers Letter (attached as Exhibit B to the Stipulation of Facts). This statement does indeed suggest that a formal lawsuit may follow (hence the term "prospective defendant"), but it also suggests that any such formal proceeding will be preceded by EEOC efforts to resolve the matter informally. The letter thus informed plaintiff that a demand for relief, based on a legal right, might well follow. Neither the letter nor the charge, however, purported to be such a demand.

The case law generally supports the conclusion that, for purposes of determining coverage under a "claims made" policy, a "claim" is "a demand for something as a right." *Phoenix Ins. Co. v. Sukut Constr. Co.*, 136 Cal.App.3d 673, 186 Cal.Rptr. 513, 515 (1982). In *Hoyt v. St. Paul Fire & Marine Ins. Co.*, 607 F.2d 864 (9th Cir. 1979), the plaintiff, a lawyer covered by the defendant's malpractice policy, received a letter from the representative of the estate of a woman whose will the plaintiff had drafted. The letter, which was received before the effective date of the malpractice policy, noted that the exercise of a general power of appointment in the will had needlessly created substantial tax liability for

the estate. The letter went on to ask for "[a]ny thought or information you have on this point." 607 F.2d at 865. The plaintiff responded, and five months later, the estate's representative wrote again, this time accusing the plaintiff of gross negligence and demanding compensation for the extra tax liability. *Id.* at 865–66. The court found that the first letter was not a "claim" within the policy, but was merely a "request for information and explanation." *Id.* at 866. The court continued: "If Hoyt was put on notice of any kind it was only that a claim might be expected to follow if the estate attorney was not satisfied with the explanation." *Id.*

The critical factor which distinguished the initial letter in *Hoyt* from a "claim" was the absence of a demand for some action by the policyholder.[6] *Cf. Phoenix Ins. Co. v. Sukut Constr. Co., supra* (demand that lawyer correct problem in mechanics lien, free of charge, constituted a "claim"); *Katz Drug Co. v. Commercial Standard Ins. Co.,* 647 S.W.2d 831 (Mo.Ct.

App.1983) (demand that employer restore employee's insurance coverage constituted a "claim"). Because no such demand was made in Mrs. Johnson's charge or in the Meyers letter, I do not find that the charge and letter constitute a "claim" within plaintiff's policy.[7]

It is unnecessary for me to determine precisely when a "claim" was "first made" in this case. After the September 1981 letter, all communications between plaintiff and the EEOC, as well as the filing of the *Johnson* complaint, took place during the period covered by the policy. Defendant does not point to any other incident which might be said to constitute a "claim" and which falls outside the policy period. Accordingly, I find that a "claim" was "first made" within the meaning of the policy sometime between February 21, 1982 and February 21, 1983.[8]

## IV. *The "Willful Violations" Exclusion*

The sole remaining issue is whether or not the actions which gave rise to the John-

---

6. The notice provision of the policy at issue in *Hoyt* reinforced the conclusion that a demand of some sort was a necessary element of a "claim." That provision required that the policyholder "immediately forward to the Company every demand, notice, summons or other process received by him or his representative." *Hoyt, supra,* 607 F.2d at 867 (quoting policy). Plaintiff's policy does not contain any analogous language, although the distinction the policy draws between a "claim" and a notice of intent to hold the insured responsible has much the same effect. Indeed, it is difficult to imagine just what separates such a notice from a "claim" unless it is a demand for compensation.

7. Defendant makes much of the fact that the Chairman of the Bensalem Township Board of Supervisors referred to the EEOC charge as "an Equal Opportunity law suit" at a Board meeting, and asked the township's solicitor to "take care" of the dispute. Stipulation of Facts ¶ 4. According to defendant, these facts show that plaintiff treated the charge as equivalent to a formal lawsuit. Even so, it is unclear how plaintiff's reaction to the EEOC letter bears on the question whether that letter constitutes a "claim" under the policy. A prudent reaction to the filing of a discrimination charge presumably includes some internal investigation to determine whether the charge has merit. It does not, however, follow that any such investigation renders that which prompted it a "claim."

In any event, plaintiff's reaction to the charge appears to have consisted primarily of waiting for the EEOC to begin *its* investigation, something which did not take place for at least six months following the filing of Mrs. Johnson's charge. *See* Stipulation of Facts, ¶¶ 4–6.

8. Defendant argues that this conclusion violates the principle that "an insured cannot insure against something which has already begun." *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.,* 676 F.2d 56, 63 (3d Cir.1982). This argument misperceives the nature of a "claims made" policy. Such policies are designed to cover liabilities which the policyholder has already incurred (in the sense that the occurrence giving rise to the liability has taken place), but which have not yet ripened into claims. Thus, even though the "claim" may have its origins in events which took place prior to the effective date of the policy, the policyholder is insured as long as the "claim" is "first made" within the time period which the policy covers.

Nor does this process require the insurer to insure against risks which have already materialized. The risk against which a "claims made" policy insures is the risk that a claim will be brought. Where, as here, the policyholder had not been asked to pay over money or to undertake affirmatively to remedy a supposed wrong, the risk that such demands might be made in the future was not yet resolved.

son litigation amount to the "willful violation of [a] statute . . . committed by or with the knowledge or consent of an insured" within the meaning of the insurance policy.

Defendant argues forcefully that my earlier decision in *Johnson,* holding (as a matter of law) that the township willfully violated the ADEA, necessarily resolves this issue. This argument assumes that the policy provision in question uses "willfully" in the same manner as the ADEA. Plaintiff, in response, notes that under *Wehr v. Burroughs Corp.,* 619 F.2d 276 (3d Cir. 1980), merely reckless conduct can give rise to a finding of willfulness under the ADEA. Plaintiff contends that the policy is at best ambiguous on the question whether reckless violation of a statute is "willful"; accordingly, the argument goes, the policy should be construed against the insurer on this issue. *See, e.g., Mohn v. American Cas. Co.,* 458 Pa. 576, 326 A.2d 346 (1974). Plaintiff's argument thus presumes that a finding of recklessness is consistent with my ruling in *Johnson.*

The issue is more complex than either side acknowledges. I begin by examining my ruling in *Johnson,* and then proceed to consider whether that ruling triggers the "willful violation" exclusion of plaintiff's insurance policy.

The Memorandum/Order in which I announced my ruling on the willful violation issue in *Johnson* does not explain the reasons for that ruling, but refers to a conference on the record held on May 16, 1984, at which I explained my rationale. *Johnson, supra,* Memorandum/Order at ¶ 1 (May 23, 1984). The full transcript of that conference has never been prepared; however, I have attached to this Memorandum a transcript of that portion of the May 16 conference in which I discussed the willful violation question. The discussion is not a long one, and for purposes of understanding precisely what I found, it bears quoting in full:

> In my judgment, willfulness for this purpose means intentionality. It doesn't connote attributing to the township some [malign] purpose to undercut federal law. The township may have thought it was doing right, may indeed have in good faith supposed that it was following a local arbitration which somehow superseded a federal statute, or conceivably somebody in the township actually believed that really the undisclosed and bad health rationale was the township objective, and age was merely being used as a ploy to make something more palatable on a public relations level or whatever. However characterized, without [meaning in] any way to impugn the good faith of the township, its action was willful, in my judgment, meeting the statute. So whatever the damages are, I think they're doubled.

*Johnson v. Township of Bensalem,* Civil Action No. 83–0449, Excerpted Transcript of Conference Held May 16, 1984. It is clear from this discussion that no finding was made as to whether the township acted in bad faith—in other words, whether the responsible officials knew or even suspected that their actions violated federal law.

Plaintiff, as I have said, argues that recklessness will support a finding of willfulness under the ADEA, and that "willful" in the insurance policy should not be read to mean merely "reckless." The discussion just quoted shows, however, that the township has been found to have been not reckless, but intentional in forcing Sergeant Johnson to retire because of his age. The language in *Wehr, supra,* which defines "willful" in the ADEA to include reckless behavior is therefore unimportant to my resolution of this case.

The more difficult question is whether the exclusion in plaintiff's policy is intended to govern intentional acts undertaken in the good faith belief that the actor was behaving legally. Nothing in the language of the policy answers this question. The exclusion in question refers to willful violations "committed by or with the knowledge or consent of an insured," apparently referring to the policyholder's knowledge of the violative act, not knowledge of the content of the law which was transgressed. The

word "willful," moreover, like the word "claim," is not defined by the policy.

I have found no Pennsylvania authority construing a "willful violations" clause in an insurance policy. The closest case is *Nationwide Mut. Ins. Co. v. Hassinger*, 325 Pa.Super. 484, 473 A.2d 171 (1984), in which the Pennsylvania Superior Court interpreted a clause excluding injuries caused by the policyholder's intentional conduct from insurance coverage. In *Hassinger*, the policyholder struck and killed a pedestrian in a parking lot, under circumstances which suggested that the collision may have been intentional. *See* 473 A.2d at 173 (car was driven over a curb and across a sidewalk before striking the decedent). The decedent's widow sued, and Nationwide denied coverage on the ground that the policyholder's conduct was intentional. The jury agreed with Nationwide, and on appeal, the policyholder challenged the trial court's instructions on the intent issue. The Superior Court approved the trial court's instructions, which were derived from the intent standard used in the Second Restatement of Torts. *Id.* at 175. That standard focuses on whether "the actor desires to cause consequences [sic] of his act, or that he believes that the consequences are substantially certain to result from it." Restatement (Second) of Torts § 8A.

The policyholder's conduct in *Hassinger* cannot have been both intentional and in good faith.[9] Here, by contrast, plaintiff contends that it acted according to what was believed to be a valid and enforceable collective bargaining agreement. Plaintiff undoubtedly knew that, by forcing Sergeant Johnson to retire, it was terminating the Sergeant's paycheck; in this sense, plaintiff "intended" to cause the injury which prompted Mrs. Johnson's lawsuit. There is no evidence on this record, however, which would require a finding that plaintiff acted maliciously or in reckless disregard of its legal obligations. Accordingly, I do not find *Hassinger* controlling.

Under these circumstances, I am bound by the hoary rule that ambiguities in insurance policies are resolved in the policyholder's favor. *See, e.g., Mohn v. American Casualty Co.*, 458 Pa. 576, 326 A.2d 346 (1974). "Willful," as used in plaintiff's policy, can be read to require knowledge or recklessness with regard to (1) the consequences of the policyholder's conduct, (2) the legality of the policyholder's conduct, or (3) both.[10] Accordingly, I find that plaintiff could reasonably have construed the policy to exclude only conduct which exhibited reckless disregard for plaintiff's legal obligations. I also find that there is a genuine issue of material fact as to whether plaintiff acted "willfully" under such a standard. Accordingly, both parties' motions for summary judgment will be denied on this issue.

## V. Conclusion

For the foregoing reasons, I shall grant plaintiff's motion for summary judgment

---

9. A number of cases in other jurisdictions have applied clauses excluding from coverage willful violations of penal statutes. Like *Hassinger*, these cases involve conduct which cannot sensibly be said to have been both intentional and in good faith. *Stevens v. Horne*, 325 So.2d 459 (Fla.Ct.App.1975) (union members hung likeness of non-union employee in effigy; court denied coverage); *Travelers Indem. Co. v. Nieman*, 563 S.W.2d 724 (Ky.Ct.App.1977) (pharmacist repeatedly sold amphetamines to customer without prescription; coverage denied); *Applewhite v. City of Baton Rouge*, 380 So.2d 119 (La.Ct.App.1979) (police officers sexually assaulted citizen; coverage denied); *American Home Assurance Co. v. Diamond Tours & Travel, Inc.*, 78 A.D.2d 801, 433 N.Y.S.2d 116 (App. Div.1980) (insurer not bound to defend travel agency against civil action for fraud). *Cf.*

*Schwamb v. Fireman's Ins. Co.*, 41 N.Y.2d 947, 363 N.E.2d 356, 394 N.Y.S.2d 632 (1977) (Mem.) (insurer was bound to defend pharmacist from malpractice action where pharmacist was alleged to have refilled prescriptions without a doctor's authorization; court stressed presence of negligence allegations).

10. The straightforward language of the policy suggests the third alternative. The word "willful" in the policy exclusion modifies the phrase "violation of statute or ordinance." "Violation," in turn, has two components: (1) conduct by the insured, which (2) transgresses a legal standard. Applying "willful" to one of these elements but not the other would be, in my view, artificial.

on the question whether a "claim" was "first made" within the effective period of the policy, and shall deny both parties' motions for summary judgment with regard to whether plaintiff acted willfully within the meaning of the clause excluding from coverage liability occasioned by the "willful violation of [a] statute." An Order to that effect accompanies this memorandum.